IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| SEVERSTAL SPARROWS POINT, LLC | * | |
| Petitioner, | * | |
| | * | |
| v. | * | Civil No. JFM-97-558 |
| | * | JFM-97-559 |
| | * | |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY AND STATE OF MARYLAND DEPARTMENT OF THE ENVIRONMENT, | * | |
| Respondents. | * | |
| | * | |
| | * | |

******

OPINION

On July 30, 2010, Severstal Sparrows Point, LLC ("Severstal") filed a Petition with this Court to resolve disputes with the United States Environmental Protection Agency ("EPA") and the Maryland Department of Environment ("MDE") pursuant to the dispute resolution provisions contained within Section XX of the 1997 Consent Decree entered in this Court in *Maryland v. Bethlehem Steel Corp.*, No. JFM-97-558 (D. Md. filed Feb. 25, 2007). The Consent Decree detailed the environmental obligations of the Bethlehem Steel Corporation ("BSC") for the Sparrows Point Facility ("the Facility"), which is now owned by Severstal. The Petition requests, *inter alia*, that I resolve a dispute over the effect of the April 23, 2003 Bankruptcy Sale Order entered by the United States Bankruptcy Court for the Southern District of New York[1] on the obligations of Severstal under the 1997 Consent Decree.

For the reasons stated below, I find that the Bankruptcy Sale Order does limit Severstal's liability under the 1997 Consent Decree to releases of hazardous wastes and hazardous

[1] *See In re Bethlehem Steel Corp., et al.*, Ch. 11 Case Nos. 01-15288 through -15302, and 01-01308 through -15315.

constituents occurring after April 23, 2003 only. That finding, however, does not lead me to conclude – as Severstal argues – that Severstal necessarily is relieved of its obligation under the Consent Decree to conduct a Site Wide Investigation ("SWI") that includes offshore media sampling. Indeed, while arguably the scope of the SWI should be limited by virtue of the fact that Severstal is not liable for remediating toxic discharges that occurred prior to April 23, 2003, Severstal's obligation to conduct a SWI is a free-standing liability that Severstal assumed when it purchased the assets of BSC. Accordingly, I will retain jurisdiction over the matter and request the parties to submit a report to me within 45 days of the issuance of this opinion, stating whether they have been able to reach agreement as to the scope of the SWI that is to be conducted.[2]

[2] Also pending is the Joint Motion for Leave to Intervene in this dispute resolution proceeding filed by Chesapeake Bay Foundation, Inc., Baltimore Water Harbor Keeper, Inc., Joseph Anderson, Arthur and Tina Cox, Rebecca Kolberg, Wilton Strong, and Connie and Jerry Tomko. The motion is granted. Intervenors do not have an unconditional right to intervene under Fed. R. Civ. P. 24(a)(1) because they are seeking to intervene in the dispute resolution, not in the original case resulting in the 1997 Consent Decree in which the intervenors would have had an unconditional right to intervene. *See* 42 U.S.C. §§ 6972(b)(1)(B), 6972(b)(2)(E). However, I find that intervenors should be permitted to intervene under Fed. R. Civ. P. 24(a)(2) because my ruling that the Bankruptcy Sale Order limits Severstal's liability under the 1997 Consent Decree to releases of hazardous wastes and hazardous constituents occurring only after April 23, 2003 practically and substantially impairs and impedes their interests. Moreover, I find their interest is not adequately represented by EPA and MDE. This is especially true in light of the fact EPA and MDE do not squarely address the effect of the Bankruptcy Sale Order on Severstal's obligations under the Consent Decree. Instead, they suggest that I can defer ruling on that issue. Finally, I find that because the intervention is into the dispute resolution only, not into the original lawsuit that led to the entry of the Consent Decree, the intervention is timely. *See generally Spring Constr. Co. v. Harris*, 614 F.2d 374, 377 (4th Cir. 1980).

I should note that because intervenors have already forcefully stated their position regarding the effect of the Bankruptcy Sale Order I need not postpone my ruling on that issue.

I.

A.

Sparrows Point is located nine miles southeast of downtown Baltimore, Maryland on a 2,300 acre peninsula on the north side of the Patapsco River. (*See* EPA Resp. 13.) BSC owned and operated the Facility from 1916 through its bankruptcy in 2003. (Severstal Pet. 8, 11.) The Facility produces hot rolled sheet, cold rolled sheet, galvanized sheet, and tin mill products. (*Id.* at 9.) In the late 1990s, EPA and MDE brought an action against BSC for violations of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq.*, the Clean Water Act ("CWA"), 33 U.S.C. § 1251 *et seq.*, and corresponding state law, which the parties settled by executing a Consent Decree, entered in this Court on October 8, 1997. (Severstal Pet. 9.)

The Consent Decree requires BSC to implement interim remedial measures, conduct a SWI, and then conduct a Corrective Measures Study. (*Id.* at 10.) Additionally, the Consent Decree imposes compliance requirements related to the two on-site landfills, Coke Point and Greys Landfills. (*Id.* at 11.) These requirements relate to the types of waste the landfills may accept, as well as inspection requirements to ensure that only acceptable wastes are disposed in the landfills. (*Id.*) The Consent Decree further establishes compliance measures for the operation of the landfills, such as sedimentation and erosion controls. (*Id.*) The Consent Decree also establishes certain Clean Air Act compliance requirements relating to kish reduction and visible emissions from the basic oxygen furnace roof monitor, in addition to pollution prevention activities. (*Id.*)

BSC filed for Chapter 11 bankruptcy on October 15, 2001. (*Id.*) On March 12, 2003, BSC entered into an Asset Purchase Agreement ("APA") with International Steel Group ("ISG") by which ISG agreed to purchase certain assets and assume certain liabilities from BSC, including

the Sparrows Point Facility. (*Id.*) The United States Bankruptcy Court for the Southern District of New York entered the Bankruptcy Sale Order approving the sale pursuant to the terms of the APA on April 23, 2003. (*Id.*) On September 12, 2003, BSC entered into a settlement agreement with the United States in the Southern District of New York in order to resolve the claims asserted by the United States in the bankruptcy action. (*See* Severstal Reply, Ex. F.)

On April 5, 2005, Mittal Steel acquired ISG, including its subsidiary ISG Sparrows Point, LLC, which owned the Facility. (Severstal Pet. 9.) In August 2005, this Court entered a Stipulated Order Implementing Modifications to Consent Decree, substituting ISG for BSC in the Consent Decree. (*See* Severstal Reply, Ex. C.) On June 26, 2006, Mittal Steel merged with Arcelor, forming ArcelorMittal as the new parent corporation. (*See* Severstal Pet. 9.) On May 13, 2008, ISG Sparrows Point, LLC merged with Severstal Sparrows Holding LLC, and the surviving entity was renamed Severstal Sparrows Point, LLC. (*See* EPA Resp. 14 n.12.) This entity, Severstal Sparrows Point, LLC, is the current owner of the Facility and the Petitioner in the instant dispute resolution proceeding.[3]

B.

During a June 29, 2009 meeting between the parties, Severstal stated that it was evaluating its legal obligation to investigate offshore media under the Consent Decree. (*Id.* at 23.) The Maryland Office of the Attorney General responded to Severstal in an August 6, 2009 letter directing Severstal to the provisions of the Consent Decree it believed required this work, and requesting a response within a week. (*See id.* at 24; Severstal Pet., Ex. 15.) In addition, MDE sent a letter to Severstal on August 13, 2009, reiterating its position and requiring Severstal to submit a work plan for evaluating the effects of offsite sediment within sixty (60) days. (EPA

[3] Accordingly, this Opinion uses the name of the current Facility owner, "Severstal," although some court documents refer to the entity as "ISG."

Resp. 24; Severstal Pet., Ex. 16.) On October 13, 2009, Severstal submitted its October 13, 2009 *Proposed Workplan*. (Severstal Pet. 19.) In its cover letter, Severstal explained that its proposed workplan was designed to identify current releases, not historic, offsite contamination.[4] (*Id.*) The workplan focused the investigation on the Coke Oven and Coke Point area of the Facility only (*see* Severstal Pet., Ex. 5), prompting EPA to partially disapprove the workplan. (EPA Resp. 25.)

In a February 3, 2010 letter, EPA responded to Severstal's proposed workplan, stating,

> First, the work proposed must not be limited to an evaluation of the current groundwater discharge impacts to offshore environment; rather, it must address current and past releases from groundwater, surface water, storm water, sediment transport and other environmental pathways. Second, the geographical boundaries of work proposed should not be limited to the Coke Point peninsula, but must also include the entire Sparrows Point shore line surrounding the steel mill, including the shipyard portion.

(Severstal Pet., Ex. 17.) EPA required a revised work plan within sixty (60) days of receipt of the letter. (*Id.*) Severstal then triggered a period of informal dispute resolution, pursuant to Section XX of the Consent Decree, by providing EPA with a Notice of Dispute on March 4, 2010. (*Id.* at 20.) Additionally, Severstal submitted a revised workplan to EPA and MDE on April 2, 2010. (*Id.*, Ex. 6.) EPA disapproved this workplan as well, stating that though the April 2, 2010 revised workplan expanded its scope beyond the Coke Oven and Coke Point area to address potential impacts from five Special Study Areas ("SSAs"), "Severstal is still refusing to perform the kind of field work necessary to actually determine the nature and extent of the contamination which is already known to be at some parts of the shoreline, and which may (or may not) be elsewhere." (EPA Resp. 27.) The EPA disapproved the April 2, 2010 revised workplan in a letter dated August 25, 2010. (*Id.*, Ex. 4.)

---

[4] "Historic" contamination refers to any contamination occurring prior to the April 23, 2003 bankruptcy sale of the Sparrows Point Facility to Severstal. (*See* Severstal Pet. 19.)

The parties met on April 26, 2010 as part of the Consent Decree's informal dispute resolution process in an effort to resolve their disagreement over Severstal's obligation to investigate offsite releases under the Consent Decree in light of the Bankruptcy Sale Order. (Severstal Pet. 20; EPA Resp. 26.) The parties were unable to reach a resolution, and EPA responded to Severstal's March 4, 2010 Notice of Dispute with a Proposed Resolution on June 30, 2010, in accordance with Section XX.A.3 of the Consent Decree. (*See* Severstal Pet., Ex. 8.) The Parties' inability to informally resolve this dispute prompted Severstal to file this petition for dispute resolution on July 30, 2010. (*Id.* at 20.)

On August 3, 2010, Severstal filed a Motion to Produce Record in Support of Petition for Review. (ECF No. 12.) Believing the motion to be unopposed, this Court granted it on September 1, 2010. (ECF No. 14.) The EPA filed a Motion for Reconsideration on September 15, 2010. (ECF No. 16.) Severstal's Response and the EPA's Reply were timely filed. On November 2, 2010, this Court sent a memorandum to Severstal and EPA requesting that they confer with one another to ascertain whether they could agree upon the documents to be produced. (*See* ECF No. 30.) The parties met on November 17, 2010, but were unable to resolve all of their disputes regarding production. (*See* Severstal Status Report, ECF No. 36; EPA Status Report, ECF No. 37.) This Court then scheduled a hearing for December 20, 2010. (ECF No. 38.)

At the conclusion of the December 20, 2010 hearing, this Court denied both Severstal's Motion for Expedited Production and EPA's Motion for Reconsideration without prejudice in order to determine first the effect of the Bankruptcy Sale Order upon the scope of the Consent Decree. (*See* Mot. Hr'g Tr. 31, Dec. 20, 2010.) A hearing to address this issue was held on March 11, 2011.

II.

The Consent Decree provides:

> [T]he standard of judicial review of a final agency action shall be applied, and BSC shall have the burden of demonstrating under such standard that the decision of EPA and/or MDE was in error. For any disputes arising under Section V [regarding Corrective Measures Work to be Performed] of this Consent Decree, BSC shall have the burden of demonstrating that the decision of EPA is arbitrary and capricious or otherwise not in accordance with law.

(Severstal Pet., Ex. 1 at 71.) In interpreting a consent decree, the district court's authority depends on the terms of the decree. *See Pigford v. Veneman*, 292 F.3d 918, 924 (D.C. Cir. 2002) (internal citation omitted). The issue regarding the effect of the Bankruptcy Sale Order on the Consent Decree is not one of Consent Decree interpretation, however. Rather, it is a question of law and thus subject to *de novo* review. Of course, once I determine the extent to which the Consent Decree is amended by the Bankruptcy Sale Order, any decision EPA makes interpreting the mandates of Consent Decree is to be afforded the deference ordered by the Consent Decree.

III.

ISG (now Severstal) purchased the Sparrows Point Facility out of BSC's bankruptcy pursuant to the March 12, 2003 APA. (*See* Severstal Pet., Ex. 3.) Section 1.3 of the APA, "Assumption of Liabilities," provides:

> [A]t the Closing, Buyer shall assume and thereafter pay, perform, and discharge when due, all of the following liabilities . . .
> (c) except as set forth in Section 1.4(a), all liabilities and obligations of any Seller relating to the Acquired Assets[5] and arising under any Environmental Law . . .

[5] The APA defines "Acquired Assets" as "all of the properties and assets of Sellers, wherever located, whether real or personal, tangible or intangible, existing or hereafter acquired and whether or not reflected on the books or financial statements of Sellers, excluding only the Excluded Assets, including without limitation . . . all owned real property and leased real property (the Leased Real Property together with the Owned Real Property, the 'Real Property') of any Seller, together with all appurtenant, subsurface and mineral rights, licenses, rights-of

(*Id.*, Ex. 3 at 5.) Section 1.4 details the excluded liabilities, including Section 1.4(a), which excludes,

> all liabilities and obligations of Sellers [BSC] for
> (i) any environmental, health or safety matter (including, without limitation, any liability or obligation arising under any Environmental Law)
> (A) relating to any property or assets other than the Acquired Assets;
> (B) resulting from the transport, disposal or treatment of any Hazardous Materials by any Seller on or prior to the Closing Date to or at any location other than the Real Property; and
> (C) relating to any personal injury of any Person resulting from exposure to Hazardous Materials or otherwise, where such exposure or other event or occurrence occurred on or prior to the Closing Date and
> (ii) any fine or other monetary penalty imposed on or prior to the Closing Date by any Government for acts or omissions of any Seller or any Joint Venture relating to any environmental, health or safety matter;

(*Id.*, Ex. 3 at 6.) Severstal asserts that liability for BSC's offsite contamination falls within Sections 1.4(a)(i)(A) and (B) of the excluded liabilities in the APA. (*Id.* at 12.)

Severstal's reading of Section 1.4(a)(i)(B) is correct. That subsection excludes liability "resulting from the transport, disposal or treatment of any Hazardous Materials by any Seller on or prior to the Closing Date to or at any location other than the Real Property." (*Id.*, Ex. 3 at 6.) "Disposal" is defined under RCRA as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3). Importantly, the Fourth Circuit has held that the term "disposal" has a range of meanings under applicable environmental law, including passive migration offsite. *See Nurad*,

---

way, . . . including, without limitation, the Real Property listed on Schedule 1.1(b)" (Severstal Pet., Ex. 3 at 2.) Schedule 1.1(b) states, in part, "All of Seller's right, title and interest in and to the Owned Real Property located in: Sparrows Point . . ." (*Id.*, Ex. 3 at Schedule 1.1(b).) The Sparrows Point Facility is thus clearly an "Acquired Asset" under the APA.

*Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837, 845 (4th Cir. 1992).[6] In fact, well before the 2003 APA and Bankruptcy Order, the Fourth Circuit interpreted the RCRA definition of disposal, 42 U.S.C. § 6903(3), as having not only an active component, but also a "passive component: hazardous waste may leak or spill without any active human participation." *Nurad, Inc.*, 966 F.2d at 845; *see also Crofton Ventures L.P. v. G&H P'ship*, 258 F.3d 292, 300 (4th Cir. 2001) (finding that in order to impose liability, CERCLA did not require the owner of property to prove that the former owners actively dumped a hazardous contaminant on the site; simply demonstrating that the contaminant leaked during ownership was sufficient); *Sherwin-Williams Co. v. ARTRA Grp., Inc.*, 125 F. Supp. 2d 739, 749 (D. Md. 2001) ("[D]isposal may occur by spilling or leaking 'without any active human participation.'") (citing *Nurad, Inc.*, 966 F.2d at 845).

Against this background, I read Section 1.4(a)(i)(B) of the APA as excluding Severstal from liability resulting from active discharge, deposit, injection, dumping, as well as passive spilling or leaking "of any Hazardous Materials by any Seller on or prior to the Closing Date to or at any location other than the Real Property." Therefore, I find that Section 1.4(a)(i)(B), as approved by the Bankruptcy Court, relieves Severstal of liability for direct disposal offsite, as well as migration to offsite locations, of hazardous materials by BSC, the entity responsible for such disposal as the site owner prior to the closing date in 2003.

That said, an agreement between private parties to restrict liability for violation of federal and state environmental laws may well be contrary to public policy. The APA between BSC and ISG, however, was judicially approved after notice had been given. On April 23, 2003, the

---

[6] Although the *Nurad* court interpreted "disposal" in the context of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), and not RCRA, CERCLA incorporates by reference the RCRA definition of "disposal." *See* 42 U.S.C. § 9601(29) (incorporating the definition from 42 U.S.C. § 6903(3)).

Bankruptcy Court for the Southern District of New York entered the Bankruptcy Sale Order which approved the sale of the Sparrows Point Facility to Severstal pursuant to the terms of the APA. The Bankruptcy Sale Order states, in relevant part,

> 7. Except for the Assumed Liabilities,[7] pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the Acquired Assets shall be transferred to ISG Buyer, and upon the Closing shall be, free and clear of all Interests of any kind or nature whatsoever . . .
> 9. Nothing in this Order or the Agreement shall be construed to release or nullify any liability to any governmental entity under police or regulatory requirements that any entity would be subject to as the owner or operator of property after the closing except to the extent otherwise compromised.
> 10. The transfer of the Acquired Assets to ISG Buyer pursuant to the agreement constitutes a legal, valid, and effective transfer of the Acquired Assets, and shall vest ISG Buyer with all right, title, and interest of the Sellers in and to the Acquired Assets free and clear of all Interests of any kind or nature whatsoever other than the Assumed Liabilities.

(Severstal Pet., Ex. 2 ¶¶ 7, 9-10.) This order was authorized by a Section 363 sale under the Bankruptcy Code, 11 U.S.C. § 363, and eliminates Severstal's liability for toxic discharge that occurred prior to the date of the order's issuance.[8] *See UMWA 1992 Benefit Plan v. Leckie*

[7] The term "Assumed Liabilities" in the Bankruptcy Sale Order has the same meaning ascribed to it in the APA. (*See* Severstal Reply Mem., Ex. B at 1 n.1.) The "Assumed Liabilities" are thus defined in the APA Section 1.3-1.4.

[8] Paragraph eleven of a Settlement Agreement entered into between BSC and the United States in September 2003 expressly referred to the APA and the exclusion it contained. (*See* Severstal Reply Mem., Ex. F ¶ 11.) A Stipulated Order entered on August 1, 2005 implementing modifications to the Consent Decree also references the APA, stating "Bethlehem and ISG Acquisition Corp. ('ISG') entered into an agreement on March 12, 2003 [the APA], by which ISG agreed inter alia, to assume all the ongoing obligations of the Consent Decree, as amended." (Severstal Pet., Ex. 11.) In the next paragraph, the Stipulated Order explains that ISG assumed ownership of the Sparrows Point facility on April 30, 2003, and the Order substitutes ISG for BSC in all provisions of the Consent Decree in the following paragraph. (*Id.*) The parties dispute the meaning of the "as amended" language in the Stipulated Order. Severstal asserts that the language refers to an amendment of the obligations of Severstal under the Consent Decree, achieved through the Bankruptcy Sale Order. (Severstal Reply Mem. 29.) MDE and EPA, on the other hand, argue that the Stipulated Order acts only to substitute ISG for BSC in the Consent

*Smokeless Coal Co.*, 99 F.3d 573, 585 (4th Cir. 1996); *In re Gen. Motors Corp.*, 407 B.R. 463, 505-08 (Bankr. S.D.N.Y. 2009).

IV.

For these reasons, I find that under the Consent Decree Severstal is not liable for remediating any discharges that occurred prior to the date of the Bankruptcy Sale Order. However, the Consent Decree independently requires that the owner of the Facility conduct a SWI in order to evaluate the risk to human health and the environment from current and past releases of hazardous wastes at the Facility. (*See* Severstal Pet., Ex. 1, Attach. B.)

Severstal, adopting an argument made by ArcelorMittal during the March 11, 2011 hearing, contends that this obligation does not include investigation of offshore sediment as part of the SWI, but rather requires Severstal only to investigate the onshore real property. In support of that contention Severstal points to a document discovered by Severstal during its review of MDE files that states that the SWI will take an "'outside-in' approach where the site boundary was used as the starting point of the site wide investigation." The document also states that there will be a site-wide assessment of "hazardous wastes and other pollutants" to "evaluate their effects/impacts off-site" (Severstal Supplemental Post-H'rg Mem., Ex. 1.) This document does

---

Decree. (*See* Mot. Hr'g Tr. 40, Dec. 20, 2010.) Severstal appears to have the better of the argument. The title of the Stipulated Order indicates more than one change to the consent decree, referring to "Modifications to Consent Decree." This language implies that the Stipulated Order modified the Consent Decree in two ways: amending the obligations under the Consent Decree and substituting ISG for BSC as the party responsible for complying with those amended obligations. This implication seemingly is confirmed by the fact that the Stipulated Order states that ISG assumed the ongoing obligations of the Consent Decree, as amended, on March 12, 2003, the date that ISG and BSC entered into the APA. ISG did not assume ownership of the facility until April 30, 2003, and therefore did not step into the shoes of BSC until that date. In any event, as the authority that has continuing jurisdiction over the Consent Decree, I find that Severstal's duties under the Consent Decree were modified by the Bankruptcy Sale Order. If the Stipulated Order entered on August 1, 2005 did not itself eliminate Severstal's liability for historic contamination, I would enter another order accomplishing that result.

appear to reflect that at least some staff members of MDE were of the view that the SWI envisioned by the Consent Decree did not include offshore media sampling. On the other hand, on October 13, 2009, Severstal itself appeared to recognize that the SWI properly would include offsite investigation because that work plan proposed some offshore sediment sampling at the Coke Oven/Coke Point area. (*See* Severstal Pet., Ex. 5 at 2-3.)

Against this background I would not find that the EPA's and MDE's interpretation of the Consent Decree as requiring the investigation of offshore sediment to be arbitrary or capricious. However, EPA and MDE interpreted the agreement based upon the assumption that Severstal was at least potentially liable for remediating historic, offsite contamination. This assumption was erroneous. Accordingly, as stated earlier in this Opinion, I ask EPA and MDA to reconsider their decision and request the parties to submit a report to me within 45 days stating whether they have been able to reach agreement as to the scope of the SWI that is to be conducted at Severstal's expense. I will, of course, review the decision made EPA and MDA under the arbitrary and capricious standard set forth in the Consent Decree.[9]

A separate order effecting the rulings made in this Opinion is being entered herewith.

---

[9] I note that Severstal also contends that even if the SWI should include investigation of offshore media, the SWI should not extend to waters along the perimeters of the Sparrows Point Shipyard Facility. Severstal argues that the Shipyard Property was sold prior to Severstal's purchase of the Sparrows Point Facility and that as a result, Severstal has no obligation to conduct an investigation of current or historic releases from the Shipyard Property. (Severstal Pet. 14).

As the EPA explains in its Response, however, it has not required Severstal to conduct an investigation within the Shipyard Property as part of the SWI. (EPA Resp. 9.) Rather, the EPA has required Severstal to investigate the offshore media along the perimeter of the Shipyard Property because there are storm water drains throughout Sparrows Point, some of which run from the Facility through the Shipyard Property, potentially releasing contaminated runoff, sediment, and infiltrated groundwater into offshore areas from the Facility. (*Id.* at 9-10.) EPA thus included investigation of the Shipyard Property perimeter in the SWI as part of the overall characterization of the Facility's conditions. (*Id.*) If EPA and MDE conclude that the SWI should include investigation of offshore sediment, their desire to extend the investigation to water adjacent to the Shipyard Property clearly would not be arbitrary and capricious.

July 5, 2011 /s/

Date J. Frederick Motz

United States District Judge